EDWARD S. SNOW, PETER DESNOYERS, ANDREW McCLEL-
LAND AND GEORGE C. JONES v. HENRY WEBER,
CAROLINE WEBER, DEWITT C. HOLBROOK,
JENNIE JENKS AND THE WEBER
FURNITURE COMPANY.

*Bill for rescission of transfer of stock.*

Transferees of stock that. had been improperly issued, on asking to
have it placed to their credit on the books were refused, but
were told that they might return it and take certain securities
that had been given as collateral to the note of the original pur-
chaser, and the stock was afterwards dealt with and some of it
changed hands on that understanding. The assets of the com-
pany afterwards passed into the hands of one who claimed the
securities as part of them, but who was not a *bona fide* pur-
chaser and stood in no better position than the company. *Held*
that any transaction that would restore the parties to the status
in which they were before the sale, was not objectionable, and
that as the promise to return the securities had been acted upon,
the transferees, if they all agreed to do so, could file a bill to
obtain the securities on giving up their stock.

Appeal from the Superior Court of Detroit. Sub-
mitted June 12. Decided June 21.

INJUNCTION to restrain transfer of securities except to
complainants. Bill dismissed. Complainants appeal.

*Levi Bishop* for complainants.

*D. C. Holbrook* for defendants.

CAMPBELL, C. J.    This bill is filed to obtain certain securities in the hands of defendant Holbrook, which it is claimed belong to complainants and defendant Jenks under an arrangement whereby they were to become the property of those parties in settlement of their claim for a certain amount of stock in the Weber Furniture Company.

These securities of the nominal value of ten thousand dollars, but of about half that actual value, were formerly the property of one Alvin Wilkins.    Some facts are admitted and some disputed.    It appears that in September, 1872, the Weber Furniture Company issued to Wilkins ten thousand dollars of full paid stock, which he subsequently transferred for value to various parties now represented by complainants and Jenny Jenks. To pay for this stock, if it was sold to him, as it was at least in form, he gave his notes—as claimed by defendants,—and to secure them he transferred the securities in question as collateral.

The purchasers of this stock—or their assigns—applied to the officers of the company to have it transferred to them on the books.    Mr. Weber, who was general manager and president, and who seems to have had entire control of the company matters, refused to make the transfer.    Andrew McClellan, William W. Wheaton, Robert Hosie, Albert Ives and Peter Desnoyers all agree in their statements that Weber refused the transfer, but agreed that the holders of the Wilkins stock might take the securities in exchange for the stock, they being then in the hands of D. C. Holbrook, the attorney of the company.    Upon these assurances made to various persons, and expressly relied upon in the purchase and sale of the stock, the holders all acted, and so did purchasers. Mr. Holbrook is shown to have given them the same understanding.    The completion of the transfer was to await the consent of all the owners of the Wilkins stock.

None of the gentlemen who called on Mr. Weber testify that he expressed any willingness to transfer the stock on payment or on any terms. It was worth more than par, and the refusal seems to have been absolute, although he gives a different version. There was no reason, on his theory, why the company, if they meant to recognize the stock, did not sell the securities and determine the amount of their lien if they had one. It is evident they meant to repudiate the stock if they could, and, whatever may have been their legal or equitable liability, the purchasers were at a disadvantage in being compelled to settle or litigate, and all parties preferred settlement.

The last interview of Mr. Wheaton was in the fall of 1874, when the arrangement was definitely recognized, and when certain of the stock was about to be sold by Mr. Ives as assignee of Mr. Hosie, and both Ives and Hosie made similar visits and got the same information, and on the strength of it the stock was purchased by persons bidding at that sale.

The next spring a fire occurred, and the company made an assignment to George Moebs. Proceedings in bankruptcy were commenced against them, and withdrawn upon a composition—Mr. Bernard Stroh paying twenty per cent. and taking the assets. These securities are not mentioned in any of the transfers or proceedings. Weber's wife purchased the assets from Stroh, and now claims these securities among them.

Holbrook claims a lien for professional services.

The services on which the lien is asserted were private services for Weber and not for the company, and Weber could not have used these securities or charged them directly or impliedly for his own debt.

So far as Caroline Weber is concerned, she is not in any proper sense a *bona fide* purchaser, and stands at best in no better position than the company.

As between the company and Wilkins, such a sale of stock was not in the usual course of corporate business.

The law contemplates that stock shall not be issued as fully paid until actually paid for, and that when otherwise subscribed it shall be paid for by assessments duly called in. By issuing the stock in the form used, the company asserted that it was paid, and would as to purchasers probably have been estopped from denying it. As to Wilkins, it could not properly hold the collaterals and repudiate the stock at the same time. Whether the statute giving a lien on stock for indebtedness to the corporation can be construed to give it for the purchase price of stock issued as fully paid, and for which notes secured by other collaterals were accepted as payment, may be open to some consideration if the transaction was strictly valid.

But there can be no doubt that any transaction which restored the stock and put the company where it would have been had no sale been made to Wilkins, was unobjectionable, and was practically equivalent in its effect to a rescission. If Wilkins had continued to hold the stock it would have been nothing but a rescission. The object of all the negotiations was to put the parties *in statu quo*, by giving back for the stock the securities given for its purchase.

Under these circumstances, and treating it as such an agreement, we see no difficulty in sustaining it. As soon as all the purchasers agreed, so that the whole stock was represented, the rescission became practicable and the fund capable of conversion. No formal contract was necessary, as there was nothing in the business within the Statute of Frauds. The parties were induced to act upon the faith of the understanding with full knowledge on the part of the company that it was contemplated and done, and after encouraging such action there could be no withdrawal without fraud.

In our opinion the complainants have made out a complete equity, and should receive the relief prayed.

The decree dismissing the bill should be reversed and a decree made providing that the complainants and Jen-

ny Jenks within four months file with the clerk of the court below transfers or surrenders of their stock, and that the securities be thereupon transferred to them, or to some trustee in their behalf to be held for their benefit in proportion to their several interests. Complainants to recover costs of both courts.

The other Justices concurred.